1

2

3

4                    **UNITED STATES DISTRICT COURT**

5                         **DISTRICT OF NEVADA**

6
       BASIC MANAGEMENT INC., a Nevada          )
7      Corporation; BASIC REMEDIATION            )           2:02-cv-0884-RCJ-RJJ
       COMPANY LLC, a Nevada Limited Liability   )
8      Company; BASIC ENVIRONMENTAL              )
       COMPANY LLC, a Nevada Limited Liability   )           **ORDER**
9      Company,                                  )
                                                 )
10                    Plaintiffs,                )
                                                 )
11            vs.                                 )
                                                 )
12     UNITED STATES OF AMERICA,                 )
       ATLANTIC RICHFIELD COMPANY, a             )
13     Delaware Corporation; COMBINED METALS     )
       REDUCTION COMPANY, a Utah Corporation;    )
14     DOES 1-25; and DOES 25-50,                )
                                                 )
15                    Defendants.                )
       _____       )

16

17            This matter comes before the Court on multiple motions for summary judgment.    The Court

18     has considered the motions, the pleadings on file, and oral argument on behalf of all parties.  For the

19     reasons discussed below, the Court grants the motions in part and denies the motions in part.

20                                **BACKGROUND**

21            Plaintiffs consist of three Nevada corporations, Basic Management, Inc. ("BMI"), Basic

22     Remediation Company, LLC ("BRC"), and Basic Environmental Company, LLC ("BEC").  They

23     initiated a contribution action under the Comprehensive Environmental Response, Compensation,

24     and Liability Act of 1980 ("CERCLA"), §§ 107 and 113, 42 U.S.C. §§ 9607 and 9613, regarding

25     land currently owned by Plaintiffs on which Defendants had allegedly disposed waste prior to

1  Plaintiffs' ownership.  The site (hereinafter, "the BMI Complex") was initially used for military

2  purposes, primarily a magnesium plant, during World War II, after which the land was divided and

3  changed hands and uses several times.

4       Defendant United States owned the BMI Complex through several government agencies,

5  including the Defense Plant Corporation ("DPC"), from 1941 until 1949.  DPC was organized on

6  August 22, 1940, under the authority of section 5D of the Reconstruction Finance Corporation Act.

7  All of DPC's stock was owned by the Reconstruction Finance Corporation ("RFC"), a corporate

8  entity created and controlled by the federal government.  In 1941, the United States authorized the

9  financing, construction, and operation of the Basic Magnesium production facilities at the site.[1]  The

10 facility was designed to aid the National Defense Program by producing magnesium, which was used

11 for aircraft construction, bombs, tracer bullets, and other incendiary ammunition.  DPC contracted

12 with Basic Magnesium, Inc. ("Basic Magnesium") to construct and operate a wartime magnesium

13 plant in Nevada.

14      Basic Magnesium was a company formed as a joint venture between Basic Refractories, Inc.,

15 an Ohio company, and Magnesium Electron Ltd., a British company.  Basic Refractories owned

16 claims to magnesium bearing ore deposits in Nevada through its subsidiary, Basic Ores, Inc., while

17 Magnesium Electron had the "know how" regarding a German-based magnesium production

18 technology.  Basic Refractories held 55% of Basic Magnesium's stock while Magnesium Electron

19 held a 45% interest in the company. On August 1, 1941, DPC entered into an agreement with Basic

20

21

22

---

23      [1]  The magnesium production facility was originally designated by the United States as

24 "Plancor 201."  For ease of reference herein, the Court will refer to Plancor 201 as "the BMI
   Complex" or the "facility."

25                              Page 2 of  30

1  Magnesium[2] to build and operate a magnesium plant in Nevada between Lake Mead and Las Vegas.

2  This 1941 Agreement provided that (1) Basic Magnesium would assist DPC with the acquisition of

3  sites, equipment, machinery, water, power and utilities; (2) title to all real property, buildings, and

4  machinery would vest with DPC; (3) Basic Magnesium would manage and operate the facility on

5  behalf of DPC as an independent contractor for DPC; (4) all persons managing and operating the

6  facility would be employed by Basic Magnesium; and (5) Basic Magnesium was to sell and

7  otherwise dispose of magnesium metal, alloys, and other products from the facility only at the

8  direction of, and for the account of, DPC.

9         DPC ultimately owned the BMI Complex site in Henderson, Nevada, which consisted of

10  4,080 acres of land purchased from private individuals (purchased by Basic Magnesium and deeded

11  to DPC on November 27, 1941) and 14,360 acres of land owned by the United States that was

12  withdrawn from all forms of appropriation by Executive Order No. 8927, dated October 29, 1941.

13  Due to problems with Basic Magnesium's management of the facility, the DPC recruited Defendant

14  Atlantic Richfield Company's ("Atlantic Richfield") predecessor in interest, Anaconda Copper

15  Mining Co. ("Anaconda"), to takeover Basic Magnesium and its construction and operation of the

16  facility.  The facility included magnesium production facilities, including a chlorine and caustic soda

17  plant, and associated waste disposal areas–primarily evaporation ponds for waste water disposal.

18  Anaconda came to an agreement with DPC and replaced Basic Refractories as Basic Magnesium's

19  controlling shareholder when Anaconda bought 52.5% of its shares in 1942.  On October 20, 1942,

20  the United States purchased from Basic Refractories the mining claims located at Gabbs, Nevada,

21  which were the source of magnesite ore for Basic Magnesium.  The United States owned the mining

22        [2] Basic Magnesium, Inc., was later dissolved in 1941, and a new entity was formed by

23  reorganizing Basic Ores into a nearly identically named company, Basic Magnesium,
Incorporated.  The dissolution of Basic Magnesium, Inc. assigned the 1941 Agreement to the new

24  Basic Magnesium.

25

1   claims until 1949, when it, acting through the War Assets Administration and RFC, sold the claims

2   and related BMI Complex facilities and land at Gabbs, Nevada, to Basic Refractories through a series

3   of transactions between 1940 and June 27, 1955.

4          When Anaconda took over operations at the BMI Complex, it placed its Chief Engineer,

5   Wilbur Jurden, in charge of the design, construction, operation, and maintenance of the magnesium

6   plant.  Anaconda placed its officers and directors in identical positions at Basic Magnesium.

7   Additionally, Anaconda provided some staff support to the plant, loaning Anaconda employees to

8   the plant who were paid for by Anaconda.  Anaconda expanded the plant's waste management

9   ponds, installed new caustic waste disposal lines from the chlorine plant to the waste water disposal

10  system, acquired waste storage equipment, erected protective fencing, and supervised the operation

11  of other waste management systems.

12         DPC owned the real property at the BMI Complex from November 1941 through June 30,

13  1945.  The DPC contract with Basic Magnesium provided for the design, construction, and

14  installation of equipment for the entire complex.  DPC also owned the equipment, machinery, tools,

15  material, and supplies used to construct and operate the plant.  DPC required a full description of

16  every item purchased or acquired by Basic Magnesium and required that it mark or stamp all such

17  items to indicate DPC's ownership.  Basic Magnesium could sell magnesium metal, magnesium

18  alloys, and other products produced at the plant but only at the direction of and for the account of

19  the United States.  DPC, per contract with Basic Magnesium, owned all the technical expertise or

20  "know how" regarding magnesium production at the facility.  In addition to proprietary control, DPC

21  also retained control over production levels at the site.

22         The facility began production of chlorine on August 3, 1942.  It began production of

23  magnesium on August 31, 1942.  Magnesium production ceased in November 1944, while the

24  chlorine and caustic soda plant remained in production until May 1945.

25                                    Page 4 of  30

1    RFC held title to the facility from June 30, 1945 through June 3, 1949.  On June 3, 1949,

2  RFC transferred a large portion of the site to the State of Nevada, acting by and through the Colorado

3  River Commission of Nevada.  In 1952, the principal tenants of the site purchased the majority of

4  the land from the United States and formed one of the corporate plaintiffs, BMI, which thereafter

5  managed the property.  The United States Navy also used a portion of the site from 1953 until 1962,

6  during which time it operated an ammonium perchlorate plant.  BMI acquired the remainder of the

7  land from the United States Navy in 1962.  By 1976, tenants on the property used only the lined

8  drainage ditches and ponds at the site for waste disposal.

9    During the 1980s, the land was examined for potentially harmful soil and groundwater risks.

10  The contaminants found at the site include: volatile organic compounds ("VOCs"), semivolatile

11  organic compounds ("SVOCs"), pesticides, polychlorinated biphenyls ("PCBs"), dioxins and

12  difurans, metals, perchlorate, radionuclides, and asbestos.

13    In 1991, certain former owners and then-current owners and operators of the BMI Complex

14  entered into the first of a series of consent agreements with the State of Nevada Division of

15  Environmental Protection ("NDEP").  NDEP began a series of testing and cleanup procedures for

16  the site.  Plaintiffs were not parties to the 1991 agreement.  Several entities, including Plaintiffs,

17  entered into a second consent agreement with NDEP in 1996.  On June 29, 1999, Plaintiffs and other

18  non-party PRPs signed the BMI et al. Settlement Agreement and Release, also known as the "Soils

19  Settlement Agreement."  On February 22, 2002, Plaintiffs and other non-party PRPs signed the

20  BMI/Montrose Groundwater Settlement Agreement and Release, also known as the "Groundwater

21  Settlement Agreement."  On February 15, 2006, several entities, including Plaintiffs, entered into

22  a third, superceding settlement agreement with the NDEP.  Plaintiffs allege that they have incurred

23  in excess of $22 million in response costs investigating, characterizing, and remediating releases of

24  hazardous substances at the site.

25                                     Page 5 of  30

1    Plaintiffs are named insureds on two insurance policies covering soils and groundwater

2  contamination at the BMI Complex.  These policies were issued by American International Specialty

3  Lines Insurance Company ("AISLIC"), a member of the AIG Insurance Group, in 1999 and 2002

4  respectively.   The premiums for the policies were paid by other PRPs, who are not parties to this

5  lawsuit.  Specifically, the Soils Settlement Agreement set up an escrow account used to purchase an

6  insurance policy for soils contamination covering remediation costs, third party claims for clean-up

7  costs, bodily injury and property damage, and legal expenses.  Similarly, the Groundwater Settlement

8  Agreement established an escrow account used to purchase an insurance policy covering remediation

9  costs, third party claims for clean-up costs, bodily injury and property damage, and legal expenses

10  for groundwater contamination and related pollution conditions not covered by the soils policy.

11    Under the soils and groundwater policies, investigation and remediation costs at the BMI

12  Complex have been pre-funded and capped.  The invoices for Plaintiffs' clean up and response costs

13  are submitted directly to AISLIC and the carrier pays the vendors directly.  All claims submitted to

14  AISLIC pursuant to those policies have been paid, totaling approximately $22 million to date.

15  Plaintiffs claim that remediation costs for soils that were incurred before the inception of the soils

16  insurance policy total $839,244.   They claim that remediation costs incurred for groundwater

17  characterization before the inception of the groundwater policy total $51,624.   Thus, the pre-

18  insurance response costs incurred by Plaintiffs total $890,868.

19    In 2002, Plaintiffs initiated a cost recovery and contribution action to recover a portion of the

20  costs of the cleanup of the site from the Defendants as other potentially responsible parties ("PRP")

21  under §§ 107(a) and 113(f)(3)(B) of CERCLA.  Plaintiffs seek contribution and recovery of expenses

22  incurred in connection with the remediation of hazardous waste at the BMI Complex and request

23  declaratory relief with respect to future remediation costs pursuant to §§ 107 and 113 of CERCLA.

24

25                                              Page 6 of  30

1    The following motions are currently before the Court for consideration:

2    (1)    Defendant Atlantic Richfield Company's Motion for Summary Judgment on Direct
            Liability (#218);

3

4    (2)    Defendant Atlantic Richfield Company's Motion for Summary Judgment on Alter
            Ego Liability (#219);

5    (3)    Plaintiffs' Motion for Partial Summary Judgment for Atlantic Richfield's Liability
            as a Responsible Party Under CERCLA (#237);

6

7    (4)    Plaintiffs' Motion for Summary Judgment for United States' Liability as a
            Responsible Party Under CERCLA (#280);

8    (5)    Defendant United States' Motion for Summary Judgment (SEALED) (#312); and

9    (6)    Defendant Atlantic Richfield Company's Motion for Summary Judgment on Relief
            Sought by Plaintiffs (SEALED) (#314).

10

11                                    **DISCUSSION**

12   **I.    Summary Judgment Standard**

13       Summary judgment is proper when "the pleadings, the discovery and disclosure materials

14   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

15   movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The purpose behind

16   summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts

17   before the Court.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

18   Where reasonable minds could differ on the material facts at issue, summary judgment is not

19   appropriate.  *Warren v. Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

20       The moving party bears the burden of informing the court the basis for its motion, together

21   with evidence demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v.*

22   *Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing

23   the motion may not rest upon mere allegations or denials in his pleadings but must set forth specific

24

25                                    Page 7 of  30

1  facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

2  248 (1986).

3  **II.     CERCLA Liability**

4          Congress enacted CERCLA to encourage the timely cleanup of hazardous waste sites by

5  placing cleanup cost liability on those responsible for creating or maintaining the condition.

6  CERCLA § 113(f) governs contribution claims, such as this one, and provides that "[a]ny person

7  may seek contribution from any other person who is liable or potentially liable under section [107(a)]

8  of this title..." 42 U.S.C. § 9613(f)(1).  Further, "[a] person who has resolved its liability to the

9  United States or a State for some or all of a response action or for some or all of the costs of such

10  action in an administrative or judicially approved settlement may seek contribution from any person

11  who is not a party to a settlement . . ." *Id.* at § 9613(f)(3)(B).  "Person" is defined in the statute as

12  "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial

13  entity, United States Government, State, municipality, commission, political subdivision of a State,

14  or any interstate body."  42 U.S.C. §9101(22).   A contribution action under § 113(f) must be

15  commenced no more than three years after the date of such an administrative or judicially approved

16  settlement.  *Id.* at § 9613(g)(3)(B).

17          CERCLA § 107 governs cost recovery actions, defines four categories of potentially

18  responsible parties ("PRPs"), and makes them liable for, among other things, "any other necessary

19  costs of response incurred by any other person consistent with the national contingency plan." *Id.*

20  at § 9607(a)(4)(A)-(B).  A cost recovery action must be commenced within six years after initiation

21  of physical on-site construction of the remedial action.  *Id.* at § 9613(g)(2)(B).  To prevail in a

22  private cost recovery action, Plaintiffs must establish that: (1) the site on which the hazardous

23  substances are contained is a "facility" as defined by CERCLA, (2) a "release" or "threatened

24

25                                              Page 8 of  30

1  release" of any "hazardous substance" from the facility has occurred, (3) such "release" or

2  "threatened release" caused Plaintiffs to incur response costs that were "necessary" and "consistent

3  with the national contingency plan," and (4) the defendant is within one of four classes of persons

4  subject to liability.  42 U.S.C. § 9607; *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863,

5  870-71 (9th Cir. 2001) (en banc) (*Carson Harbor I*); *Pinal Creek Group v. Newmont Mining Corp.*,

6  118 F.3d 1298, 1300 (9th Cir. 1997).  The four classes of PRPs subject to CERCLA liability include:

7  (1) current owners and operators of the facility, (2) past owners and operators of the facility at the

8  time of disposal, (3) arrangers, and (4) transporters. 42 U.S.C. § 9607(a)(1)-(4).  A private party may

9  maintain an action under both CERCLA §§ 107(a) and 113(f) against other PRPs to recover

10  expenses associated with cleaning up a contaminated site. *United States v. Atlantic Research Corp.*,

11  551 U.S. ___, 127 S. Ct. 2331 (2007).

12          A.      **Liability vis-a-vis Atlantic Richfield**

13          Defendant Atlantic Richfield and Plaintiffs filed cross-motions for summary judgment as to

14  Atlantic Richfield's liability.  (*See* ## 218, 219, and 237.)  The Court agrees with the parties that

15  summary judgment is appropriate at this time because a trial would not provide any further

16  evidentiary basis for a resolution of liability.

17          The issue before the Court is whether Atlantic Richfield is a covered person, or PRP, who

18  may be liable under CERCLA.  Plaintiffs claim that Atlantic Richfield, through its predecessor

19  Anaconda, is liable as a past operator of the BMI Complex and an arranger for the disposal of

20  hazardous substances at the facility.  Plaintiffs assert that Atlantic Richfield is both directly liable

21  for Anaconda's own actions as an operator and arranger as well as derivatively liable under a veil

22  piercing theory that Anaconda was the alter ego of Basic Magnesium.  Atlantic Richfield contests

23  liability on both theories, but it does not contest successor liability if Anaconda was an operator or

24  arranger.

25

1.      **Direct Liability**

Atlantic Richfield argues in its Motion for Summary Judgment on Direct Liability (#218) that Plaintiffs cannot show that Atlantic Richfield's predecessor, Anaconda, either (1) directly operated the magnesium production facility at the BMI Complex, or (2) arranged for the disposal of hazardous waste at the BMI Complex.  Essentially, Atlantic Richfield claims that Anaconda's relationship with its subsidiary, Basic Magnesium, was within the accepted norms of the parent-subsidiary relationship, and thus, the parent cannot be held liable for the actions of its subsidiary.  Plaintiffs argue that Anaconda's control over Basic Magnesium so permeated its day-to-day activities that Anaconda was in direct control of and managed the operations of the Basic Magnesium facility.

a.      **Operator**

The seminal case on liability of a parent corporation is *United States v. Bestfoods*, 524 U.S. 51 (1998).  The Supreme Court found that nothing under CERCLA "bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary." *Id.* at 65.  Thus, "the parent is directly liable for its own actions." *Id.*  Under *Bestfoods*, the test for determining whether a parent corporation may be held directly liable as an operator of a facility run by its subsidiary is "not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." *Id.* at 68.  Accordingly, an "operator" in this context "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67.

In evaluating whether the parent corporation directly operated the facility, the Court must look to the actions of the parent's officers, directors, and managers at the subsidiary's facility to

1  determine the extent of their involvement.  The Court recognized that there are three scenarios in

2  which the parent can be held directly liable for its actions:

3       (1)    when the parent operates the facility in the stead of its subsidiary or alongside the
              subsidiary in some sort of a joint venture; . . .

4       (2)    [where] a dual officer or director might depart so far from the norms of parental
              influence exercised through dual officeholding as to serve the parent, even when
5             ostensibly acting on behalf of the subsidiary in operating the facility; . . . [and]

6       (3)    [where] an agent of the parent with no hat to wear but the parent's hat might manage
              or direct activities at the facility.

7  *Id.* at 71.

8       However, the dual relationship of joint officers and directors in itself is not sufficient to

9  establish liability.  "[I]t is entirely appropriate for directors of a parent corporation to serve as

10 directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to

11 liability for its subsidiary's acts."  *Id.* at 69 (citations and internal quotations omitted).  Moreover,

12 "directors and officers holding positions with a parent and its subsidiary can and do 'change hats'

13 to represent the two corporations separately despite their common ownership."  *Id.* (citations and

14 internal quotations omitted).  "Since courts generally presume 'that the directors are wearing their

15 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, it cannot be enough to

16 establish liability here that dual officers and directors made policy decisions and supervised activities

17 at the facility."  *Id.* at 69-70.  Indeed, the Court must distinguish "a parental officer's oversight of

18 a subsidiary from such an officer's control over the operation of the subsidiary's facility.  Activities

19 that involve the facility but which are consistent with the parent's investor status, such as monitoring

20 of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions,

21 and articulation of general policies and procedures, should not give rise to direct liability."  *Id.* at 72

22 (internal quotations and citations omitted).  Hence, "[t]he critical question is whether, in degree and

23 detail, actions directed to the facility by an agent of the parent alone are eccentric under the accepted

24 norms of parental oversight of a subsidiary's facility."  *Id.*

25                              Page 11 of 30

1    This question of "eccentricity" is the gravamen of the parties' disagreement over direct

2   liability.  Atlantic Richfield argues that Anaconda's actions at the BMI Complex were consistent

3   with a parent's normal oversight over its subsidiary, whereas Plaintiffs argue that the same actions

4   establish Anaconda's control over the operation of Basic Magnesium's facility.  Both parties use the

5   same facts to support their interpretations.  These facts include overlapping managers, directors, and

6   employees of Anaconda and Basic Magnesium, Anaconda's involvement in building, engineering

7   design, and daily operations of the facility, and Anaconda's involvement in the design and funding

8   of waste management and disposal systems.  Atlantic Richfield asserts that Anaconda's role is

9   consistent with the norms of parental supervision of a subsidiary and are akin to the role played by

10   a consultant.  However, Plaintiffs have shown sufficient involvement by Anaconda beyond the norms

11   of parental supervision to establish that Anaconda was an operator of the facility, thereby rendering

12   Atlantic Richfield directly liable for its actions.

13                          **b.    Arranger**

14   Arranger liability under CERCLA arises when "any person who by contract, agreement, or

15   otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such

16   person, by any other party or entity, at any facility . . . owned or operated by another party or entity

17   and containing such hazardous substances."  42 U.S.C. § 9607(a)(3).  The term "arranged for" is not

18   defined in CERCLA.  The "issues involved in determining 'arranger' liability under CERCLA are

19   distinct from those involved in determining 'owner' or 'operator' liability."  *Coeur D'Alene Tribe*

20   *v. Asarco, Inc.*, 280 F.Supp.2d 1094, 1130-31 (D. Idaho 2003), citing *Cadillac Fairview/California,*

21   *Inc. v. United States*, 41 F.3d 562, 564 (9th Cir. 1994).  Indeed, "arranger liability requires active

22   involvement in the arrangements of disposal of hazardous substances. However, control is not a

23   necessary factor in every arranger case.  The Court must consider the totality of the circumstances

24

25                          Page 12 of  30

1 . . . to determine whether the facts fit within CERCLA's remedial scheme. . . . [T]here must be a

2 'nexus' that allows one to be an arranger." *Id.* at 1131 (internal citations omitted).

3 There are two lines of cases in the area of direct arranger liability: (1) "traditional" arranger

4 liability cases in which "the sole purpose of the transaction is to arrange for the treatment or disposal

5 of the hazardous wastes," *United States v. Shell Oil Co.*, 294 F.3d 1045, 1054 (9th Cir. 2002)

6 (citations omitted), and (2) "broader" arranger liability, in which "control is a crucial element of the

7 [fact-specific] determination of whether a party is an arranger." *Id.* at 1055.  With respect to the

8 broader arranger liability, the court noted that "[t]here is no bright-line test, either in the statute or

9 in the case law, for a broad theory of arranger liability under § 9607(a)(3).  Rather, we are required

10 to sort through the fact patterns of the decided cases in order to find similarities and dissimilarities

11 to the fact pattern of our case." *Id.* at 1055-56.  After evaluating the cases identified by the *Shell Oil*

12 court as broader arranger liability cases, the applicable standard was identified by one district court

13 as follows: "Arranger liability requires a person to: (1) own or possess waste and arrange for its

14 disposal; or (2) have the authority to control and to exercise some actual control over the disposal

15 of waste." *Coeur D'Alene Tribe*, 280 F.Supp.2d at 1132.

16 This is not a traditional arranger liability case.  Hence, the Court looks at the control

17 Anaconda had over the disposal of waste under the broader theory of arranger liability.  Plaintiffs

18 use the same facts to argue Atlantic Richfield's arranger liability as operator liability and have shown

19 that Atlantic Richfield, through its predecessor Anaconda, possessed waste and arranged for its

20 disposal and had the authority to control and exercised some actual control over disposal of the

21 waste.  Atlantic Richfield is therefore liable as an arranger.

22 **2.   Derivative Liability**

23 Plaintiffs contend that the very same actions by Anaconda's personnel that render Atlantic

24 Richfield directly liable due to Anaconda's operation of the facility also render Atlantic Richfield

25 Page 13 of  30

1   derivatively liable under the theory that Basic Magnesium was Anaconda's alter ego.  Atlantic

2   Richfield disputes this contention and asserts that there is no evidence to support veil piercing in this

3   case.

4         The Supreme Court acknowledged in *Bestfoods* that "[c]ontrol of the subsidiary, if extensive

5   enough, gives rise to indirect liability under the statutory language" of CERCLA.  524 U.S. at 68.

6   However, the Court differentiated between direct operator liability and indirect derivative liability,

7   stating:  "Indeed, if the evidence of common corporate personnel acting at the management and

8   directorial levels were enough to support a finding of a parent corporation's direct operator liability

9   under CERCLA, then the possibility of resort to veil piercing to establish indirect, derivative liability

10  for the subsidiary's violations would be academic."  *Id.* at 70.  Consequently, there is a higher

11  threshold for Plaintiffs to surmount in order to establish that Anaconda was Basic Management's

12  alter ego and thus, warranting a veil piercing finding.

13        It is unclear whether the Court is obliged to apply federal common law or Nevada law in

14  determining whether to pierce the corporate veil for purposes of derivative CERCLA liability.  *See*

15  *Bestfoods*, 524 U.S. at 64 n.9 ("There is significant disagreement among courts and commentators

16  over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead

17  apply a federal common law of veil piercing.").  The Ninth Circuit has not spoken on the issue.

18        CERCLA itself states that with respect to § 113(f) contribution actions, "[s]uch claims . . .

19  shall be governed by Federal Law."  42 U.S.C. § 9607(f)(1).  Additionally, the Supreme Court has

20  held that applying federal law is appropriate where (1) national uniformity in law is needed with

21  respect to federal programs, (2) application of state law would frustrate the objectives of the federal

22  programs, and (3) application of a federal rule would not otherwise disrupt commercial relationships

23  predicated on state law.  *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728-29 (1979).  On the

24  other hand, courts have looked to state law in other areas of CERCLA liability.  *See Bestfoods*, 524

25                                Page 14 of  30

1   U.S. at 64 n.9; *Atchison, Topeka and Santa Fe Railway Co. v. Brown & Bryant, Inc.*, 159 F.3d 358

2   (9th Cir. 1998).  However, the Court need not decide whether to apply state law or federal common

3   law as Plaintiffs have not met their burden to show that veil piercing is appropriate under either

4   standard.

5          Under Nevada law, the following requirements must be met to pierce the corporate veil: (1)

6   the corporation is influenced and governed by the stockholder asserted to be its alter ego; (2) there

7   must be such unity of interest and ownership that corporation and the stockholder are inseparable

8   from each other, and (3) adherence to the corporate fiction of a separate entity would sanction fraud

9   or promote a manifest injustice.  N.R.S. § 78.747; *Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 496 (Nev.

10  1998); *Rowland v. Lepire*, 662 P.2d 1332, 1337 (Nev. 1983); *see also Goff ex rel. Estate of Torango*

11  *v. Harrah's Operating Co.*, 392 F.Supp.2d 1244, 1245 (D. Nev. 2005).   The Ninth Circuit alter ego

12  test requires consideration of: (1) the amount of respect given to the separate identity of the

13  corporation by its shareholders, (2) the fraudulent intent of the incorporators, and (3) the degree of

14  injustice visited on the litigants by recognition of the corporate entity.  *Ministry of Defense of the*

15  *Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 769 (9th Cir. 1992); *see also Bd. of Trs. v.*

16  *Valley Cabinet & Mfg. Co.*, 877 F.2d 769, 772 (9th Cir. 1989).

17         Plaintiffs have not shown that Anaconda's involvement in Basic Magnesium's operations

18  are so extensive as to render Basic Magnesium a sham or "dummy" corporation under either state

19  law or federal law.  Indeed, Basic Magnesium did have many separate employees, officers, directors,

20  and managers who were not related to Anaconda, a separate corporate structure, separate finances

21  and contracts in its own name, among other differences.  Most importantly, Plaintiffs have not shown

22  any fraudulent intent on the part of the incorporators or any manifest injustice resulting from the

23  separate corporate identity.  Anaconda's financial motivations in acquiring Basic Magnesium do not

24

25                          Page 15 of  30

1  support a finding of fraud.  Accordingly, piercing the corporate veil here is inappropriate, and

2  Atlantic Richfield is not derivatively liable under an alter ego theory.

3          **B.      Liability vis-a-vis the United States**

4          Defendant United States and Plaintiffs filed cross motions for summary judgment as to the

5  liability of the United States.  (*See* ## 280, 312.)  Plaintiffs claim that the United States is liable

6  under CERCLA as a past owner[3] of the BMI Complex and arranger for the disposal of hazardous

7  substances at the facility.   Specifically, Plaintiffs claim that the United States is liable for

8  contamination of the site for its World War II magnesium plant operations and for its involvement

9  with an ammonium perchlorate facility from 1945 to 1962.  The United States argues that it has long

10 ago admitted it was an owner during World War II and thus a "covered person" under CERCLA,

11 Plaintiffs previously waived any claim for post-World War II wastes, and there is no basis to

12 establish the United States as an "arranger" under CERCLA.  Additionally, in its Motion (#312), the

13 United States argues that Plaintiffs failed to establish that they have (1) "incurred" (2) "response"

14 costs that are (3) "necessary" and (4) "consistent with the national contingency plan" as required by

15 CERCLA to maintain a private party contribution action.

16         Given the United States' admission of ownership of the BMI Complex during World War

17 II, the issues before the Court are (1) whether Plaintiff waived any post-World War II era claims

18 against the United States, (2) whether the United States is an "arranger," and (3) whether Plaintiffs

19 have satisfied the statutory requirements for maintaining a private party contribution action.

20

_____

21         [3] Although Plaintiffs claim that the United States is also liable as an "operator," they do
22 not seek summary judgment on liability on this issue and "specifically reserve that issue for
   trial."  Plaintiffs only seek summary judgment on the United States' liability as an owner and
23 arranger.  (*See* Pltfs' Memorandum in Support of Pltfs' Mtn. for Summ. Jmt. Against the United
   States of America, #280, at 2 n.2).

24                                    Page 16 of  30

25

1    **1.    Waiver of Post-World War II Era Claims**

2        The United States argues that Plaintiffs waived their claims against the United States for

3    disposal of post-World War II wastes at the facility.  The United States argues that Plaintiffs

4    conceded the issue in earlier briefs in this case and should not be allowed to renounce their

5    concession.  Plaintiffs, however, have asserted the United States' post-wartime liability consistently

6    in their original Complaint, First Amended Complaint, and Second Amended Complaint.  Thus, the

7    Court finds the waiver argument unpersuasive.

8    **2.    Arranger Liability**

9        Again, this is not a case of traditional arranger liability.  Looking then at the broader theory

10   of arranger liability, "[a]rranger liability requires a person to: (1) own or possess waste and arrange

11   for its disposal; or (2) have the authority to control and to exercise some actual control over the

12   disposal of waste." *Coeur D'Alene Tribe*, 280 F.Supp.2d at 1132.  Plaintiffs have shown that the

13   United States had the authority to control and exercise some actual control over the disposal of waste

14   at the BMI Complex.  The United States owned the raw materials, the process materials, the products

15   and by-products, and the wastes, before, during and after processing; it contracted for the building

16   of the complex including waste disposal facilities; and it knew and approved of the waste disposal

17   activities at the facility.  Therefore, the United States is liable as an arranger.

18   **3.    Contribution Action Requirements**

19       In order to maintain a contribution claim under § 113(f)(3)(b), "[a] person who has resolved

20   its liability to the United States or a State for some or all of a response action or for some or all of

21   the costs of such action in an administrative or judicially approved settlement may seek contribution

22   from any person who is not a party to a settlement . . ." 42 U.S.C. § 9613(f)(3)(B).  Additionally,

23   Plaintiffs must establish that: (1) the site on which the hazardous substances are contained is a

24   "facility" as defined by CERCLA, (2) a "release" or "threatened release" of any "hazardous

25                          Page 17 of  30

1    substance" from the facility has occurred, (3) such "release" or "threatened release" caused Plaintiffs

2    to incur response costs that were "necessary" and "consistent with the national contingency plan,"

3    and (4) the defendant is within one of four classes of persons subject to liability.  42 U.S.C. § 9607.

4    There is no dispute among the parties that the BMI Complex is a "facility" at which there was a

5    "release" of a "hazardous substance."  The issues arise over whether Plaintiff "incurred" "response

6    costs" that were "necessary" and "consistent with the national contingency plan."[4]

7                              **a.    Incur**

8            In order to seek contribution for costs under CERCLA, Plaintiffs must actually "incur" costs.

9    However, CERCLA itself does not define the term "incur," nor does any case law.  The United

10   States urges the Court to look to the dictionary definition of "incur" as "to become liable or subject

11   to."  American Heritage Dictionary (4th ed. 2000).  The United States argues that under this

12   definition, Plaintiffs have not "incurred" any costs "because they are not responsible for or subject

13   to the costs.  Instead, they obtained two insurance policies, one covering soils and one covering

14   groundwater, rendering the insurance company liable for all costs pursuant to the terms of the

15   polices."  (U.S. Mtn for Summ. Jmt. #312, at 24.)  The United States also claims that the insurance

16   companies have waived their rights to subrogation in this matter.

17           Indeed, the vast majority of Plaintiffs' costs have been paid directly by their insurance

18   policies from AISLIC.  However, insurance payments do not amount to "shifting liability" to the

19   insurance companies, thereby contractually absolving Plaintiffs from liability.  Plaintiffs are still

20   ultimately liable, under CERCLA, for their role in the contamination of the BMI Complex.  Under

21   this analysis, Plaintiffs have "incurred" liability for the cleanup.  However, the Court believes that

22   

23           [4]  The national contingency plan is a set of regulations promulgated by EPA pursuant to
     CERCLA § 105, 42 U.S.C. § 9605, which sets forth the standards and procedures required for
24   CERCLA response actions.  40 C.F.R. Part 300, *et seq.*

25                              Page 18 of  30

1    the term "incurred" costs is more specific than that. Rather, the term should include the requirement

2    that a Responsible Party has or will actually incur the specific cost for which it seeks contribution.

3    Otherwise, they are only obtaining a contribution windfall for a cost which they will never incur or

4    have to pay. While it is true that Plaintiffs could have paid for the costs themselves and submitted

5    those claims to AISLIC for reimbursement under the insurance polices, the fact remains that AISLIC

6    pays the vendors directly and is obligated to do into the future. While the Court agrees that Plaintiffs

7    have incurred liability for the cleanup, it concludes that Plaintiffs have not incurred the specific costs

8    directly paid by or reimbursable by the insurer..

9                              **b.      Response Costs**

10          The United States asserts that Plaintiffs' costs, if incurred by them, totaling over $22 million

11   to date, are not recoverable "response costs" under CERCLA. Response costs are costs incurred in

12   relation to assessing, monitoring, cleaning, and removing released hazardous substances, minimizing

13   damage to the public health or environment from the hazardous substances, and achieving a

14   permanent remedy. *See* 42 U.S.C. § 9601(23)-(25) (defining "response," "remove," "remedy," and

15   "removal action"). Plaintiffs have submitted ample evidence that these costs at the BMI Complex

16   for investigating, characterizing, and remediating the contamination are costs of response. The Court

17   finds that the Plaintiffs' costs, to the extent incurred by them, are response costs under CERCLA.

18                              **c.      Necessary**

19          CERCLA does not define the term "necessary," and again, the United States urges the Court

20   to look to the ordinary meaning of the word as "indispensable" or "absolutely essential." American

21   Heritage Dictionary (4th ed. 2000). The Ninth Circuit has focused on "whether there is a threat to

22   human health or the environment and whether the response action is addressed to that threat."

23   *Carson Harbor I*, 270 F.3d at 872.

24

25                              Page 19 of 30

1      The United States argues that the costs claimed by Plaintiffs were not "necessary" because

2 they chose the most expensive of three alternatives for cleanup of the site.  Specifically, the United

3 States claims that the $10 million option of on-site capping of soils was all that was "necessary" to

4 remediate the site.   Instead, Plaintiffs chose the much more expensive $74 million option of

5 excavation and disposal of soils at an on-site landfill in order to meet residential land use standards

6 for the cleanup.  The United States argues that this was not cost-effective and was far more than

7 necessary to address the threat to human health and the environment, motivated solely by Plaintiffs'

8 intent to profit from sale of the property to residential developers, simply making the land more

9 valuable for subsequent resale or development.  Plaintiffs argue that CERCLA does not require the

10 least expensive method of response, that their motive is irrelevant, and the option selected was the

11 one approved by the NDEP.

12      There is no authority supporting the United States' argument that the term "necessary"

13 requires that the least expensive clean-up option be used for the site.  The Court disagrees with the

14 United States' argument that "cost-effective" inherently means "least expensive."  Rather, "cost-

15 effective" must refer to the most cost effective method for alleviating the threat to human health and

16 the environment in the specific location, surroundings and likely uses for the land.  For example if

17 land is located in a wilderness or broad desert area, costs required to prepare the land for further

18 development or residential use under state or zoning residential requirements would be inappropriate

19 for contribution recovery.  On the other hand, if the property is in the middle of other high density

20 residential or commercial uses, full remediation of potential health and environmental hazards would

21 be greater.   Similarly, if the pollution effects can be expected to travel underground to other

22 residential or environmentally sensitive sites, simple overhead encapsulation may be insufficient

23 under this law.  Given the site's location in Henderson, Nevada, and its proximity to residential

24

25                                     Page 20 of  30

1    developments, it is reasonable to conclude that the more expensive excavation option to meet a

2    higher cleanup standard was necessary to address the threat to human health and the environment.

3                   **d.       Consistency with the National Contingency Plan**

4           The United States argues that Plaintiffs' actions at the site are not consistent with the

5    National Contingency Plan ("NCP") as required by CERCLA.  Specifically, the United States

6    contends that the Plaintiffs' actions are deficient because:  (1) there was not (and will not be before

7    the cleanup) an appropriate remedial investigation/feasibility study ("RI/FS") incorporating both a

8    baseline risk assessment and identification of all applicable or relevant and appropriate requirements

9    ("ARARs"), (2) they failed to select a cost-effective remedy (discussed above), (3) and they failed

10   to ensure a "CERCLA-quality cleanup" because the agreement with NDEP does not meet CERCLA

11   standards, they cleaned two portions of the site under less stringent response action requirements

12   instead of more stringent remedial action requirements, and there was not meaningful public

13   participation.  Plaintiffs contest these allegations by pointing out that they have done the appropriate

14   types of investigations and studies, they selected a cost-effective remedy which does not equate with

15   the cheapest alternative available, and they performed a CERCLA-quality cleanup "substantially"

16   in compliance with the NCP as required by CERCLA.  Plaintiffs also assert that whether they

17   incurred response costs necessary and consistent with the NCP presents disputed issues of material

18   fact that are appropriate for trial.

19          The Court does not agree that this issue presents disputed issues of material fact precluding

20   summary judgment.  However, consistency with the NCP is not an element of CERCLA liability,

21   but rather, a factual issue effecting which response costs Plaintiffs may recover.  *See Vine Street*, 460

22   F.Supp.2d at 759, citing *Amoco Oil v. Borden, Inc.*, 889 F.2d. 664,  668 (5th Cir. 1989) (establishing

23   the general prima facie elements of CERCLA liability).  Because the vast majority of the response

24

25                                   Page 21 of  30

1   costs herein were paid for by Plaintiffs insurance policies, and are unrecoverable as explained below,

2   the issue of whether the pre-insurance costs incurred are consistent with the NCP is one that remains

3   for a subsequent allocation trial.

4   **III.   Relief**

5        Having determined that both Atlantic Richfield and the United States are responsible parties

6   for the disposal of hazardous wastes under CERCLA and Plaintiffs' directly incurred response costs

7   to clean up those wastes, the Court must now address whether Plaintiff can properly recover those

8   costs in this action.  Atlantic Richfield moves for summary judgment against Plaintiffs claiming that

9   (1) they have not met the statutory requirements for maintaining a contribution action under § 113,

10   (2) they are prevented from obtaining a double recovery of their response costs, and (3) declaratory

11   relief is inappropriate because there is insufficient evidence to establish future liability and the total

12   amount of response costs is unknown at this time. (*See* #314.)  Similarly, the United States argues

13   in its motion for summary judgment against Plaintiffs that (1) they have not met the statutory

14   requirements for maintaining a contribution action under § 113, and (2) they are prevented from

15   obtaining a double recovery of their response costs.  (*See* #312.)

16       **A.   Resolution of Liability**

17        In order to maintain a contribution claim under § 113(f)(3)(b), "[a] person who has resolved

18   its liability to the United States or a State for *some or all* of a response action or for *some or all* of

19   the costs of such action in an administrative or judicially approved settlement may seek contribution

20   from any person who is not a party to a settlement . . ." 42 U.S.C. § 9613(f)(3)(B) (emphasis added).

21   Defendant Atlantic Richfield asserts that Plaintiffs' Agreements with NDEP, and particularly the

22   2006 Agreement, do not satisfy the criteria for a settlement that resolved Plaintiffs' liability at the

23   site, and therefore, Plaintiffs are precluded from obtaining the relief sought against Atlantic

24

25                    Page 22 of  30

1   Richfield.   Additionally, Atlantic Richfield asserts that any costs incurred prior to the 2006

2   Agreement (under the 1991 and 1996 Agreements) are barred by the three-year statute of limitations

3   in CERCLA for contribution actions.

4          The plain language of § 113(f) states that a person "who has resolved its liability" to a State

5   for "some or all of a response action" in "an administrative . . . settlement" may seek contribution.

6   *Id.*  It is apparent in this case that Plaintiffs have resolved some of their liability to the State of

7   Nevada (NDEP) for some of the response action.  The settlement satisfies this criteria even though

8   portions of the response action (pertaining to two specific chemicals and the Las Vegas Wash) have

9   been excluded from the 2006 Agreement.

10         Under  § 113(g)(3), the party has three years from the date of the settlement to file a

11  contribution claim.  *Id.* at § 9613(g)(3)(B).  The Plaintiffs filed this action on June 27, 2002.

12  (Complaint, #1.)  That was within three years of the Plaintiffs' soils agreement, so the statute of

13  limitations has been met.

14         **B.       Recoverable Response Costs**

15         Both Atlantic Richfield and the United States argue that Plaintiffs should be precluded from

16  recovering any costs that have been paid under their insurance policies because CERCLA bars

17  double recovery.  Further, the insurance company is not a party nor does it have any subrogation or

18  contribution rights that can be prosecuted by Plaintiffs.  Additionally, Defendants argue that certain

19  categories of costs claimed by Plaintiffs, such as attorney fees, expert witness fees, and costs not

20  consistent with the NCP, are not recoverable.

21         CERCLA § 114 provides that:

22             Any person who received compensation for removal costs or damages
               or claims pursuant to this chapter shall be precluded from recovering
23             compensation for the *same removal costs* or damages or claims
               pursuant to any other State or Federal law.  Any person who receives

24

25                              Page 23 of  30

> compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter.

42 U.S.C. § 9614(b) (emphasis added).  A plain reading of this statutory language favors Defendants' interpretation that the double recovery bar prevents Plaintiffs from recovering costs paid by AISLIC.  Plaintiffs argue that the statute only bars double recovery from the same parties under different causes of action.  The Court disagrees.  Plaintiffs' insurers are billed directly for response costs and have paid all costs for the past eight years.  Permitting Plaintiffs to recover those costs again constitutes a double recovery.

Plaintiffs argue that they should not be precluded from receiving the costs that they are entitled to under CERCLA simply because they had the foresight to purchase insurance.  Plaintiffs cite to the "collateral source rule" in tort law as precluding Defendants from offsetting their CERCLA liability with any insurance monies received by Plaintiffs.  Restatement (Second) of Torts § 920A, 920 (1979).  The collateral source rule provides that if an injured party received some compensation for injuries from an outside source, independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor. *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534-535 (9th Cir. 1962); *see generally* 22 Am. Jur. 2d *Damages* § 392 (2003); *Bass-David v. David*, 134 P.3d. 103, 110 (Nev. 2006).  Plaintiffs urge the Court to adopt the collateral source rule in the instant case, although there is no authority supporting application of the rule in a CERCLA context.

In *Gypsum Carrier*, the Ninth Circuit applied the collateral source rule in a Jones Act claim.  As Plaintiffs correctly point out, the Jones Act is a federal negligence statute that allows any seamen who suffer personal injury in the course of their employment to maintain an action for damages at law.  46 U.S.C. § 688.  The Ninth Circuit held in *Gypsum Carrier* that the injured seaman plaintiff,

Page 24 of 30

1  who had received disability payments from the California Disability Fund, could not have his

2  recovery under the Jones Act reduced by the collateral payments.   The court further held that it

3  accepted the collateral source rule "as applicable to the computation of damages in Jones Act

4  litigation," just as other federal courts had in suits resting upon the Federal Employers' Liability Act.

5  307 F.2d at 535.   In so holding, the court stated that:

6           The question is not whether a windfall is to be conferred, but rather
             who shall receive the benefit of a windfall which already exists.   As
7           between the injured person and the tortfeasor, the former's claim is
             the better, This may permit a double recovery, but it does not impose
8           a double burden.   The tortfeasor bears only the single burden for his
             wrong.   That burden is imposed by society, not only to make the
9           plaintiff whole, but also to deter negligence and encourage due care.

10  *Id.* at 534. However, the court noted: "Furthermore, damages for personal injury are usually not, and

11  as a practical matter cannot be, fully compensatory.   The additional recovery will rarely make the

12  injured person more than whole." *Id.*

13          Unlike cases that sound in tort, including those under the Jones Act, CERCLA contribution

14  actions are not injury actions in which the injured party is seeking compensation for damages to be

15  made whole again.   Rather, in the context of a CERCLA contribution action, the environment is the

16  injured party and the parties responsible for causing that injury who fronted the money to fund the

17  repair of that environmental damage are entitled to reimbursement from the other responsible parties

18  to the extent of their shared or allocated liability.   In other words, Plaintiffs have not been damaged

19  and are not "entitled" to money as a damaged party; but rather, Plaintiffs can only receive

20  reimbursement for the costs they expended beyond their share of actual responsibility for the

21  environmental damage.   There is an actual dollar amount associated with those costs, and in this

22  case, almost all of those costs have been paid directly by Plaintiffs' insurers, and without further

23  right of subrogation in the insurers.   In other words, no party or potential party here has incurred a

24

25                                  Page 25 of  30

1  cost as a PRP for which they could seek "contribution" from another PRP.  Allowing Plaintiffs to

2  recover those costs "again" from Defendants would in essence allow Plaintiffs to profit from their

3  own and prior contamination of the site simply because they are in the subsequent chain of title.  The

4  purpose of the Contribution element of CERCLA was to reallocate the remedial cost to those who

5  were ultimately responsible for the pollution, not to provide a windfall recovery for parties who

6  happen to be in the chain of title.  That is undoubtedly the reason for the addition of the prohibition

7  against double recovery in this very statute.

8       In this vein, the court's opinion in *Vine Street, LLC v. Keeling*, 460 F.Supp.2d 728 (E.D. Tex.

9  2006), is instructive.  In *Vine Street*, the plaintiff received reimbursement of its response costs from

10  two other PRPs through their insurer.  The court agreed with the defendant's argument that the

11  plaintiff should not recover its reimbursed response costs and that, at most, it should be able to

12  recover only its net costs.  460 F.Supp.2d. at 764.  The court, having found no "previous instance

13  in which a private CERCLA claimant received reimbursements for nearly all its past and present

14  response costs prior to any adjudication of responsibility," looked to the cases addressing the issue

15  of double recovery generally for guidance.  *Id.* at 764.  The *Vine Street* court explained:

16          In government-prosecuted CERCLA actions, a non-settling
            responsible party's liability for the government's response costs is
17          reduced by the dollar amount of previous settlements with the
            government. . . .  The settling party's actual responsibility for the
18          contamination is irrelevant to this reduction requirement.  *See O'Neil*,
            682 F.Supp. at 730.  Once the CERCLA claimant obtains complete
19          recovery from one or more responsible parties, that claimant cannot
            obtain additional recovery under CERCLA because this would create
20          impermissble double recovery.  *United States v. Occidental Chem.
            Corp.*, 200 F.3d. 143, 148-49 & n. 7 (3d Cir. 1999) (adopting the
21          common law "one satisfaction rule" from Restatement (Second) of
            Judgments § 49 cmt. A. (1982)).

22

23  *Id.* at 765 (citing 42 U.S.C. § 9613(f)(2); *see United States v. Broderick Inv. Co.*, 955 F.Supp. 1268,

24  1277 (D. Colo. 1997), *rev'd in part on other grounds sub. nom. United States v. Burlington N.R. Co.*,

25                              Page 26 of 30

1    200 F.3d 679, 699-700 (10th Cir. 1999); *O'Neil v. Picillo*, 682 F.Supp. 706, 730 (D.R.I. 1988)).  The

2    court continued:

> Other CERCLA provisions also reflect Congress's apparent desire to
> prevent claimants from recovering the same response costs twice.
> *See, e.g.,* 42 U.S.C. §§ 9612(f) (prohibiting double recovery of
> response costs and other particular costs from the Hazardous
> Substance Superfund), and 9614(b) (prohibiting claimants from
> recovering CERCLA response costs already recovered under other
> federal or state law).   Thus, a court may consider "'preventing
> someone from recovering for the same harm twice'" as an equitable
> factor in resolving CERCLA contribution claims.  *W. Props. Serv.
> Corp. v. Shell Oil Co.,* 358 F.3d 678, 691 (9th Cir. 2004) (quoting
> *Boeing Co. v. Cascade Corp.*, 207 F. 3d 1177, 1189 (9th Cir. 2000)).
> This is consistent with the fact that private CERCLA claimants
> cannot recover damages resulting from contamination, but can only
> be reimbursed for some or all of their incurred response costs. . . .
> Vine Street cannot make a profit on the contamination.

*Id.* (citing *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91 (2d Cir. 2000); *see Young v. United
States*, 394 F.3d 858, 862 (10th Cir. 2005) ("CERCLA is not a general vehicle for toxic tort
claims.")).

Like Plaintiffs in this case, the plaintiffs in *Vine Street* also argued that the collateral source
rule should prevent the Court from reducing their recovery by what had already been reimbursed.
The court rejected the argument as follows:

> The collateral source rule generally precludes a tortfeasor from
> obtaining the benefit of payments to the injured party from sources
> other than the tortfeasor. [citations omitted].  However, even if the
> Court were to agree with Vine Street that Texas substantive law
> applies to this issue, no court has ever applied the collateral source
> rule – a tort doctrine – in the context of a CERCLA response-cost
> reimbursement.  Because CERCLA is not a vehicle for general tort
> recovery and the Court has a broad duty to consider facts bearing on
> the proper equitable allocation of response costs, the monies Vine
> Street has already recovered are relevant.

*Id.*  The court further stated: "equity prohibits a CERCLA claimant from being reimbursed more than
once for the same response costs."  *Id.* at 765-66.

Page 27 of 30

1      The Court declines to apply the collateral source rule to the recovery of response costs in this

2 CERCLA contribution action.  The field has been preempted by the federal statutory mandate of

3 CERCLA § 114.  U.S. Const. Art. VI, cl. 2 ("This Constitution and the Laws of the United States

4 . . . shall be the Supreme Law of the Land . . ."); *Aloha Airlines, Inc. v. Hawaii Dir. of Taxation*, 464

5 U.S. 7, 12 (1983) (state law superseded by plain language of federal statute).  Equity and common

6 sense further dictate that Plaintiffs cannot recover the remediation costs paid for by their insurance

7 policies.  Likewise, Plaintiffs' state law claims for contribution and indemnity also fail.

8      Plaintiffs contend that they expended $839,244 for remediation costs for soils and $51,624

9 for remediation costs for groundwater characterization before the inception of the insurance policies.

10 There is insufficient evidence for the Court to determine the allocation of those costs.  Thus, the

11 allocation of pre-insurance response costs incurred by Plaintiffs, totaling $890,868, must be decided

12 at trial.

13      **C.**    **Declaratory Relief**

14      Section 113(g)(2) of CERCLA provides that "[i]n any such action described in this

15 subsection, the court shall enter a declaratory judgment on liability for response costs or damages

16 that will be binding on any subsequent action or actions to recover further response costs or

17 damages." 42 U.S.C. § 9613(g)(2).  Atlantic Richfield claims that declaratory relief is inappropriate

18 here because the entirety of response costs are unknown and there is insufficient evidence supporting

19 Plaintiffs' claim for relief.  Plaintiffs argue that they can assert a claim for declaratory relief under

20 CERCLA even if those response costs have not yet been incurred, and that the Court should allow

21 evidence at trial on the declaratory relief claim.  Declaratory relief is inappropriate here because total

22 response costs for the cleanup are speculative.

23

24

25                                   Page 28 of 30

**CONCLUSION**

For the reasons explained above, Defendants Atlantic Richfield and the United States are responsible parties under CERCLA for hazardous wastes disposed of at the BMI Complex. Atlantic Richfield is directly liable as an operator and arranger. The United States is directly liable as an owner and arranger. The United States' liability as an operator will be determined at trial. Although Plaintiffs has set forth cost recovery and contribution claims under CERCLA §§ 107 and 113, Plaintiffs are barred from recovering any costs covered by and paid for under their insurance policies. Plaintiffs' pre-insurance costs totaling $890,868 may be recoverable. Defendants' proportionate share of liability for those pre-insurance costs will be allocated at trial. Declaratory relief is not appropriate at this time.

IT IS THEREFORE ORDERED that:

(1)     Defendant Atlantic Richfield Company's Motion for Summary Judgment on Direct Liability (#218) is GRANTED in part and DENIED in part.

(2)     Defendant Atlantic Richfield Company's Motion for Summary Judgment on Alter Ego Liability (#219) is GRANTED.

(3)     Plaintiffs' Motion for Partial Summary Judgment for Atlantic Richfield's Liability as a Responsible Party Under CERCLA (#237) is GRANTED in part and DENIED in part.

(4)     Plaintiffs' Motion for Summary Judgment for United States' Liability as a Responsible Party Under CERCLA (#280) is GRANTED in part and DENIED in part.

(5)     Defendant United States' Motion for Summary Judgment (SEALED) (#312) is GRANTED in part and DENIED in part.

(6)     Defendant Atlantic Richfield Company's Motion for Summary Judgment on Relief Sought by Plaintiffs (SEALED) (#314) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Plaintiffs' Renewed Motion in Limine to Exclude Evidence of Environmental Insurance Policies and Environmental Insurance Payments Plaintiffs Received (SEALED) (#458) and Plaintiffs' Request for Hearing on Renewed Motion in Limine to

Page 29 of 30

Exclude Evidence of Environmental Insurance Policies and Environmental Insurance Payments Plaintiffs Received (#461) are DENIED. The hearing set for March 17, 2008, is hereby VACATED.

DATED: February 25, 2008

_____
ROBERT C. JONES
UNITED STATES DISTRICT JUDGE

(eko)

Page 30 of 30